JANUARY TERM, 1848.          369

Joseph B. Watts, Administrator of Thomas T. Clardy, *vs.* James Clardy.

JOSEPH B. WATTS, ADMINISTRATOR OF THOS. T. CLARDY, *vs.* JAMES
CLARDY.

A deed using the terms " have loaned to A. during her natural life, and after
her death hath given unto the heirs of her body which shall survive her, to
be equally divided amongst them :"

And a devise " I lend unto my daughter A., during her natural life and after
her decease to the heirs of her body, share and share about," were held as well
by the laws of South Carolina as the common law of England to create an
estate-tail in personal property so as to vest it absolutely in A., and on her
marriage in her husband.   On her death the property belonged to his admin-
istrator, and not to her heirs.

Writ of Error to Hamilton Circuit Court.

Joseph B. Watts, administrator of Thomas T. Clardy, brought
suit in Hamilton County in *detinue* against James M. Clardy for the
recovery of certain slaves named in the declaration, and alleged to
be detained by defendant.

The Jury at the trial, on the 6th of April, 1846, found a special
verdict as follows :

We, the Jury, find that Thomas T. Clardy, the plaintiff's intes-
tate, died possessed of the negroes sued for, that the plaintiff de-
manded the same from the defendant, who after the death of the said
Clardy detained and still detains the said negroes, that said demand
was duly made before suit was brought ; and the jury assess the val-
ue of the negroes as follows :

| Charles at | $600 | Sanco at | $200 |
| Daniel at | $600 | Moses at | $300 |
| Samuel at | $300 | Bella at | $300 |
| Charlotte at | $400 | Patience at | $200 |
| Silvey at | $500 | Lavinia at | $300 |
| Tenor at | $500 | Violet at | $100 |
| Maria at | $500 | Maria at | $500 |
| Cass at | $500 | Mary at | $150 |
| Boston at | $600 | Jenny at | $150 |

That the following named negroes, to wit : Charlotte, Silvey and
Tenor, are the same negroes named in a certain instrument of wri-
ting, under which defendant claims for himself, and as guardian for

47

his brothers and sisters, the property therein mentioned, dated April 21st, 1827, made by Wm. Gore, which is hereunto annexed, marked exhibit A., whereby the said negroes, with future increase, which increase since born are Maria, Boston, Cass, Sancho, Lavinia, Moses, Bella, Patience, and Jenny, were deeded to Anner Clardy, to have, hold, and enjoy during her natural life, as therein mentioned; that the following named negroes, to wit: Sam, Violet, and Maria, Daniel, and Charles, (together with Mary, child of Maria, since born,) are the same negroes which were devised, under and by virtue of the provisions of the last will and testament of William Gore, senior, in favor of Anner Clardy, as therein set forth, dated the 30th of May, 1825, and hereunto annexed, marked Exhibit B., under the provisions of which will, and the eighth and ninth clauses thereof, the defendant, James M. Clardy, for himself and as guardian for the rest of the children of said Thomas T. and Anner Clardy, claim property. That the said William Gore died 30th October, 1828; that the said Anner Clardy was his daughter, and is the same person named in said will. And the said Anner Clardy and Thomas T. Clardy were married and resident in the State of South Carolina at the several times and before the dates of said instruments, Exhibits A. and B. That said exhibits are fully proved and authenticated; that Anner Clardy departed this life in the year 1839, and that the said Thomas T. Clardy survived her and has since died, and that the plaintiff is his administrator; that the defendant, James M., and his sisters and brothers, to wit: Amanda, John, Alva, Vienna, and Mary Ann, the children of said Anner, survived her and were infants at the time of her death. And forasmuch as the jury are ignorant in point of law upon the facts of the case, on which side they ought to find the issue, they do agree that if the Court should be of opinion, that Mrs. Anner Clardy took an absolute interest, as first taker in the negroes devised under William Gore's will, by virtue of the provisions in her favor, which negroes are herein before set forth; and, also, took a like interest in the negroes above mentioned, which were deeded, with their increase, by the deed of 1827, by said William Gore, which negroes in such event, by reason of such inter-marriage, vested in her husband, Thomas T. Clardy, as absolute owner, then they find for the plaintiff, that he recover the said goods and chattels in the declaration mentioned, and so above assessed, wrongfully detained by the said defendant, or the value there-

of, as above assessed, and his damages about his suit, to wit: ten dollars and costs.

But if the Court are of an opposite opinion, and consider that the children of Anner Clardy took by purchase or remainder-men, or otherwise, at her death, under said will and under the limitations of said deed, then they find for defendant, and that he doth not detain the negroes above named; but in either event, he doth detain the negroes, Grace, of the value of one hundred dollars, and Chloe, of the value of three hundred dollars, and assess their value as above, with ten dollars damages, and costs of suit. We further find that defendant doth not detain negro Isaac, in said declaration mentioned.

THOMAS H. HAGNER.

Attorney for the Plaintiff.

B. C. POPE,

Attorney for Defendant.

ARTHUR ROSSITER,

Foreman.

(EXHIBIT A.)

STATE OF SOUTH CAROLINA, }
 Horry District. }

To all people to whom these presents shall come, I, William Gore, of the State and District aforesaid, send *Greeting :*

Know ye, that I, the said William Gore, for and in consideration of the natural love and affection which I have and bear unto Anner Clardy, during her natural life, and to the heirs of her body, and for divers good causes me hereunto moving, have loaned unto her the said Anner Clardy, during her natural life and after her death, hath given to the heirs of her body which shall survive her, to be equally divided amongst them, the following negroes, with their future increase, viz: Charlotte, Silvey and Tenor; the said Anner Clardy to have and to hold and enjoy during her natural life, the said negroes Charlotte, Silvey and Tenor, and their future increase, and after her decease, to be then equally divided between her surviving heirs, as their exclusive property. I, the said William Gore, do by these presents bind myself, my heirs, executors and administrators, and family, to the intent the said Anner Clardy shall have a life time estate in the aforesaid negroes, and at her decease to be equally divided between her surviving heirs, as aforesaid mentioned.

One thousand eight hundred and twenty-seven, witness whereof
I have hereunto set my hand and seal, this April 21st
day, Anno Domini 1827.

(Signed,)                                WM. GORE.

Recorded, Nov. 1827.

Test: JOHN GORE,
      REBKAH FRINK,
      WILLIAM BESSERT.

(EXHIBIT B.)

*In the name of God ; Amen.*

I, William Gore, Senior, of Horry District and State of South
Carolina, being of sound and perfect mind and memory, blessed be
God for it, do this 30 day of May in the year of our Lord one thou-
sand eight hundred and twenty-five, make and publish this my last
will and testament, in manner as follows: I resign my body to the ·
dust from whence it came, my soul to God who gave it me. First.
I lend unto my beloved wife Mary, during her natural life, as much
of the plantation where I now live, as much as Executors, hereaf-
ter to be named, shall think necessary for her support. Also as
many of the negroes as they shall deem proper for her comfortable
support. Also as much of my stock of cattle, sheep and hogs,
household furniture, plantation tools and so forth, together with a
good riding horse ; all which shall be during my said wife Mary's
natural life and no longer ; then to be equally divided between my
lawful heirs, share and share about.

Secondly. I give unto my son John Gore, one hundred acres of
land that he has now in possession. Also two hundred and fifty
acres lying on the Beaverdam swamp. Also three hundred and
forty-two acres of the lower part of the Daniel Gore lands.

Third. I give and bequeath unto my son William Gore, the land
that he has now in possession ; also from Poplar Branch to Cyprus
Branch, and up the said Cyprus Branch to the main road leading
from Mouney's to George Reaves' ferry ; also one hundred acres
lying above said road, being all that tract.

Fourth. I lend unto my son Jonathan Isaac Gore, the balance of
my plantation whereon I now live, after my Executors has laid off
my wife her part, and after her death, the said land which my said
Executors has laid off for my said wife Mary. Said land shall be-
gin on the lower line on Capt. Randall's corner, thence running up

little river, such a distance and out to the back line as shall make three hundred and eighty acres out of a tract of seven hundred acres which said tract of three hundred and eighty acres shall include my buildings and at least four acres around them, should the dividing line not allow it, said dividing line shall be as nearly parallel with the East line of the said tract as possible, and the balance of the said tract of seven hundred acres shall be to my daughter Mary Meike, as hereafter will be mentioned.

Fifth. I lend to my daughter Rebecca Frink, two hundred and fifty acres of land lying in the Seven Creeks, known by the name of the Rich Island; also three hundred acres taken off the upper part of the Daniel Gore tract of land lying on Gum Swamp in Columbus county, during her natural life, then after decease, I give and bequeath the said unto the heirs of her body to be equally divided betwixt them.

Sixth. I lend unto my daughter Mary Miek during her natural life three hundred and twenty acres of land whereon she now lives, being the balance of the tract that I gave to my son Jonathan Isaac Gore, and provided that his part does not include the buildings, he shall extend to take them, and she shall be allowed as many acres out of his part immediately below it; also two hundred more out of a tract lying on Cedar Creek, the balance of the tract which is fifty-two acres, to Jonathan Isaac Gore, and shall be taken off adjoining the hundred acres that he now lives upon, one hundred acres more to Jonathan I. Gore, lying on Cedar creek whereon he now lives, and if there are any of my Bigelow land left unsold at my decease to be equally divided between Mary Meik and J. I. Gore.

Seventh. I lend unto my daughter Kitey Thomas during her natural life, five hundred acres of land whereon she now lives, including Mullet creek land, bought from Maj. Day. Also two hundred acres of my Bigelow land where she formerly lived, and after her death, the land shall be equally divided between her heirs, share and share about.

Eight. I lend unto my daughter Anner Clardy, during her natural life, a tract of land in her possession, containing one hundred and fifty acres, more or less; also one other tract of five hundred acres, lying on Waccammay, where she now lives, and after her decease to return to the heirs of her body, share and share about.

Ninth. It is hereby declared to be my will, that at my decease my Executors hereafter to be named, shall divide all the remainder and

residue of my negroes, stock of all kinds, household furniture, plantation tools, ready money, debts that are due me, and all other any personal property not already divided, betwixt my said sons and daughters having an equal share, only my son Jonathan I. Gore, and my daughters Rebekah Frink, Mary Meik and Kitey Thomas and Anner Clardy are only lent during their natural lives, and then to return in manner above mentioned. Also what negroes, stock and property my wife Mary may have at her decease, shall also be equally divided between my sons and daughters in manner and form before directed.

Tenth. Also, if my lands lying in Columbia should be unsold at my decease, for to be equally divided between my sons John Gore and William Gore.

Eleventh. If there should be any debts due at my decease, each one of my heirs shall pay an equal share.

Twelfth. I also ordain my sons John Gore and William Gore, executors to my last will and testament. I also appoint them as trustees for the heirs of Jonathan Isaac Gore and Rebekah Frink, and Mary Meik and Kitey Thomas and Anner Clardy, to procure the property by me given, that they are not defrauded out of their right.

In witness whereof I have hereunto set my hand and seal, the day and date above mentioned.

    (Signed,)     WM. GORE, [SEAL.]

Signed, sealed in the presence of us.

       WILLIAM VAUGHT,

       THOMAS BRANTLEY, Jr.,

       JOSEPH VAUGHT.

On the first June, 1846, the Court below (Judge Macrae presiding,) gave judgment for the defendant, on the points of law arising upon the special verdict.

The plaintiff filed his exceptions to the opinions of the Court, and now prosecutes his writ of error in this Court, upon the following errors assigned :

1. The Court erred in giving judgment for the defendant in the Court below.

2. The judgment of the Court should have been for the plaintiff upon the special virdict in this case.

Joseph B. Watts, Administrator of Thomas T. Clardy, *vs.* James Clardy.

*Randall & Hagner,* for Plaintiff:

The questions now submitted by the special verdict and presented to this Court are :

1st. Whether the terms of said deed and will (either or both of them) legally import and convey to Anna Clardy, such an absolute interest and estate as, by reason of her intermarriage with Thomas T. Clardy, vested the same in him as absolute owner ? Or,

2d. Whether the estate vested in said Anna Clardy and her husband, being only a life interest, the residue of the interest and estate, after her death, vested in her children, the heirs of her body, who survived her, as purchasers, or remainder-men or otherwise ?

It is our duty to maintain and prove the affirmative of the first proposition and the negative (of course) of the second.

And first, to examine the will, which is prior in point of date.

The verdict refers to the 8th and 9th clauses as determining the estate which is to pass to Anna Clardy.

Both parties will probably invoke other clauses of the will as influencing the decision to be made.

On the whole will, then, we contend :

1st. *That the terms used in the 8th clause, respecting the realty, would have vested in her and did vest in her, at common law, an estate-tail general.*

We here premise that this proposition is laid down and to be discussed and proved, as furnishing the true test and indeed the only rule for ascertaining the nature and extent of the estate in the personalty, bequeathed to Anna Clardy under the 9th clause taken in connection with the 8th clause. As regards the realty, it is in conformity with the rule in Shelly's case—now and at all times an authoritative rule in England and America. See 4th Kent's Com., 221.

That rule is stated to be "that when the ancestor, by any gift or conveyance, taketh an estate of free-hold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs in fee or in tail, *the heirs* are words of limitation of the estate and not words of purchase." 4 Kent, 206. Hays on the disposition of real estate, p. 17, 46.

For the general rule we shall cite no other authorities directly,

but the Court will find it confirmed and reiterated in citations made for other doctrine to be advanced.

The will in question contains precisely such a bequest or demise in its general terms, and we will now examine if any other supplementary terms in the will vary, restrict, or control such limitation.

It may be contended that the words "lend and loan" used in reference to Anna Clardy's estate for life, vary and restrict the interest given to her, and, as containing evidence of a "*secondary*" intention variant from the general intention, overrule the latter. This we deny :

1st. Because it is one of those "petty distinctions" which, in the language of Lords Eldon and Redesdale, in Jesson *vs.* Wright, 2 Bligh. 1, (quoted from 2 Jarman on Wills, p. 286,) should not overrule the paramount intention of the testator, as evinced by the use of the technical terms "heirs of the body."

2d. The terms are not technical nor appropriate, and being used in connection with other terms of clear, unequivocal legal import, shall not be allowed to qualify the meaning.

The most that these words could import would be, that the property was not specifically given, but only "its use" for life.

Conceding this effect, then we contend that such a bequest of the use or profits or interest of chattels, conveys the right to the chattels specifically and absolutely. Robinson *vs.* Fitzherbert, 2 Brown's C. C., 127. Butterfield *vs.* Butterfield, 1 Ves. Sen., 133. Bradley *vs.* Perixot, 3 Ves., 324. Keys *vs.* Goldsbro', 2 Har. & J., 369.

Another clause may be invoked by the other side to effect such variance or qualification in the terms "return to the heirs of her body share and share about." These words import a different order of *distribution* from that the law of descent would cast in England by the common law, and *there* the argument might have plausibility at least.

*Here* they can have no effect, where the law of descent or distribution and that wrought by the will are the same. That they produce no such effect in England, the following authorities will show. Pearson *vs.* Vickers, 5 East., 548. Doe *vs.* Smith, 7 T. R., 531. Doe, &c., *vs.* Cooper, 1 East. 229. Robinson *vs.* Robinson, 1 Bur., 15. 2 Jarman on Wills, 277, 280, 287.

But the 12th and last clause may be relied upon, to fix the con-

struction of a life estate in Anna Clardy, by operation of the "trust" assigned to be raised in the Executors, as Trustees, "to procure" such remainder to the "heirs."

To this we answer, 1st. That the raising of a trust (if such arise from the terms of the 12th clause, which we day) would produce not the asserted effect.   Wright *vs.* Pearson, Amb., 358.   Doe ex dem Thong *vs.* Bedford, 4 Maul. & Sel, 36:.   8 T. R. 516—18. 1 Bro. C. C. 313.

2d. But in fact and law, this will raises no proper trust, technically so called.

No estate, vests in the trustees.   No interest or property in the subject vests in them.

The estate, title and property in the slaves and lands had previously passed to the legatees in possession and expectancy.

There is certainly *no express* conveyance of title to the trustees, nor can one arise by implication, as here no power is conveyed "to sell," "to charge," "to settle," or to do any act from which such investiture of estate or interest can arise to the .   The case in the books nearest to the present, that I can find, is that of Pigot *vs.* Garnish, Croke Eliz., 678.

This is, however, a leading case, as appears by reference to Fletcher on trustees, p. 12.

The authority there conferred was similar to the present, and ruled to be a mere "naked power."

The above remarks apply particularly to the will.

The terms of the deed are not materially variant in their limitation, and should be taken even more strongly against the grantor than the testator, for an obvious reason.

Wills are construed to favor the intention of testator, while grants in deeds are always taken most strongly against the grantor.   This is too plain a principle of law to need citation of authorities.

But we need not invoke this principle of construction.   The only new clause appearing in the deed different from that in the will, is that the limitation is to the "surviving" heirs of the body of Anna Clardy.   The cases I shall cite to prove the unimportance of this term is Richards *vs.* Lady Bergavinney, 2 Vernon, 324, where the terms used were—"and to such heirs of A's body as shall be living at her death"—terms fully equivalent to surviving heirs.   *In this case A. was ruled to have an estate tail.*   Sharp *vs.* Thompson, 1

Whart., 139. Kiffner *vs.* Knapper, 6 Watts, 18; Tidball *vs.* Lupton, 1 Rand., 194. Botts *vs.* Gillespie, 5 Rand., 273.

No trust is set up in this deed, and that point, therefore, does not arise.

II. The second general proposition : That the same terms of limitation being used in the 9th clause, connected with the 8th clause in regard to the slaves, the property in dispute, as were used in relation to the realty in the 8th clause, would have created in said slaves, also at law, an estate tail, if such limitation were allowed.—This so naturally results as a corollary from the first proposition and the facts above stated, that no distinct argument will be required to support it. It is also connected with and involved in the third general proposition, which I propound as follows :

III. The third general proposition : That terms of bequest of chattels real, or of other personalty, which in relation to devises of estates of inheritance would give either an express or implied estate tail in the first legatee, give the absolute interest or property therein to such first legatee or taker. 4 Kent's Commen., p. 277.

The reason given in Kent, and in all the authorities, is that such attempted limitation in personalty as an estate tail, is too remote and tends to produce a perpetuity.

As a rule of English Law the following cases establish it : Attorney Gen. *vs.* Bailey, 2 Brown C. C., 553 ; Robinson *vs.* Fitzherbert, Ibid, 127, Lord Kenyon's opinion ; Lord Chatham *vs.* Tothill, 6 Bro., P. C., 450, this case is stated and commented on in 11 Wend., 259 ; Britton *vs.* Twinning, 3 Meriv., 176 ; Butterfield *vs.* Butterfield, 1 Ves. Sen., 133 ; Bradley *vs.* Perixot, 3 Ves., 324 ; Ross *vs.* Ross, 1 Jac. & Walk., 154. *American Authorities.*—Dott and others *vs.* Cunnington, 1 Bay, 453 ; Stockton *vs.* Martin, 2 Bay, 471.—See also, 1 Hayward, 247, 163 ; 2 Ib., 130, 154 ; 2 Dess., 94 ; 4 Dess.; 17 ; 1 Nott & M'Cord, 69 ; 7 Yerger, 519 ; 12 Wheaton, 568. A leading case and authority is 11 Wend., 259, app. 671, Patterson *vs.* Ellis. Lastly, case of McCardle *vs.* Beatty, Ct. of App. Fla.

IV. The fourth general proposition : The charge in gross raised in the 11th clause of the will, "*per se,*" and in the absence even of other suitable limitation would raise and confer an estate of inheritance in Anna Clardy. Bacon's Ab. Tit. Legacies, Let. C. 3 ; Denn ex dem Slater *vs.* Slater, 5 T. R., 335. Jackson dem. Deck

er *vs.* Morrell, 6 T. R., 185, (Dig. N. Y., Rep., 4 Vol., p. 1264, art. 188;) Speaker *vs.* Van Alstyne, 18 Wen., 200, (referred to in 4 Dig. N. Y., Rep. p. 1258, art. 131–2.)

*Carmack,* for Defendant.

*Long & Walker,* on same side :

However edifying it may be to the "juridical scholar on whom his great master Coke has bestowed some portion of the gladsome light of jurisprudence," to trace out and dwell upon the intricate history of "*the rule in Shelley's case,*" we are content to enter upon the discussion of the construction of this will and deed according to the simple rules of law as at present understood to exist.—— The brief and elegant review of the various decisions of the British and American Courts on this subject from the Year Books down to 1830, to be found in the 4th volume of Chancellor Kent's Commentaries (214 to 233) is quite sufficient to show what is now the law on this subject. " All the modern cases contain one uniform language, and declare that the words *heirs of the body,* whether in deeds or wills, are construed as words of limitation, unless it clearly and unequivocally appears that they were used to designate certain individuals answering the description of heirs at the death of the party," is the remark of Kent in concluding his review of the English cases. It devolves upon us to satisfy the Court that in this case it " clearly and unequivocally appears" that those words are not used in their technical sense ; for says Chan. Kent, (Com. 220,) "there are several cases in which in a devise, the words *heirs* or *heirs of his body,* have been taken to be words of purchase and not of limitation in opposition to the rule in Shelley's case," and then enumerates the several classes of these cases: 1. "Where no estate of freehold is devised to the ancestor." 2. " Where the testator annexes words of explanation to the words heirs, as to the heirs of A. *now living,* showing thereby that he meant by the word heirs, a mere *descriptio personarum,* or specific designation of certain individuals." 3. " Where the testator superadds words of explanation, or fresh words of limitation, and a new inheritance is grafted upon the heirs to whom he gives the estate."

In order to determine whether the case at bar comes within either of these exceptions to the rule in Shelley's case, we will exam-

ine the two instruments under which we claim title to the negroes in controversy, as remaindermen, after the termination of the life estate of Anner Clardy. And first, as to the deed: We contend that the words "*heirs of her body*" mean children, and not general heirs, because the other accompanying expressions clearly afford that explanation. First: The property is declared only to be *loaned* to Anner Clardy, and *given* to the children. Second: Because the loan is expressly declared to be *for life* only, and this thrice expressed. Third: Because the remainder is limited to such heirs of her body " as shall survive her," which would be nonsense if applied to heirs generally, but consistent if *children* are meant.— Fourth: Because the property so given to the surviving heirs of her body is "to be equally divided between them, share and share about," which is a provision that might be inevitably defeated if heirs generally are intended.

Now we contend that these explanatory expressions bring this case within the second rule of exception above quoted from Kent, viz: " Where a testator (or in a deed the donor) annexes words of explanation to the word heirs, as to the heirs of A. *now living*, showing that he meant by the word heirs, a mere *descriptio personarum*, or specific designation of certain individuals." In this deed, instead of the explanatory words, " the heirs of A. *now living*," we have the expression, "the heirs of her body which shall *survive her*," which equally constitute a " mere *descriptio personarum*, or specific designation of particular individuals." The case given by Kent to illustrate the rule of exception is exactly in point with the case afforded by these instruments. Indeed it is too obvious to require argument that the rule of exception laid down by Kent is as clearly illustrated by this case as the one which he puts. In both, the word *heirs* is used—in the one the heirs of A. *now* living, and in the other the heirs of Anner Clardy living at her death. There is exactly the same reason for regarding the one as meaning children, and not heirs generally, as the other, viz: because it excludes the idea of any other.

To show that the case at bar comes properly within some one or other of the exceptions before mentioned, we will cite such American decisions as we have been able to find on this subject. Judge Carmack having already dwelt sufficiently upon the English cases, we shall make no reference to them.

Joseph B. Watts, Administrator of Thomas T. Clardy, vs. James Clardy.

Learned counsel on the other side laid great stress upon the case of Keating and Wife vs. Reynolds, reported in 1st Bay, 80, because " it is a case decided in South Carolina where this deed was made." We also invoke the particular attention of the Court to that case, not only " because it was decided in South Carolina, where the deed was made," but also because it is a case directly in point to sustain our position. It appears in that case that Samuel Thorpe had two daughters, Martha and Sarah. He gave fourteen negroes " to her, the said Martha Thorpe, *and the heirs of her body forever."* He gave fourteen other negroes " to the said Sarah Thorpe, *and the heirs of her body forever."*  " But if the said Sarah and Martha Thorpe should die without having a lawful heir of their *body to live,* then and in that case he gave and devised those slaves above mentioned to be equally divided to the survivors." Martha died without issue living at her death, and her husband, Norris, sold some of her fourteen negroes to the defendant, Reynolds. Suit was brought by Sarah and her husband, Keating, to recover said slaves from Reynolds, and the Supreme Court of South Carolina decided that Sarah and her husband should recover, because, in the language of Judge Waties, " *the heirs of her body to live,* mean *children,* if they mean anything." So we think in the case at bar that the words "heirs of her body which shall survive her," "mean *children,* if they mean anything."

The decision in 1st Bay, 80, is not at all shaken by the decision in 2d Bay, 471, for "in the *habendum* of this deed (in 2d Bay, 471) the negroes were given to Miss Havens for life, and then *to the heirs of her body,* and in the warranty of this deed, he warrants the negroes to his daughter for life, and *then to the heirs of her body.*"— " The majority of the Judges were of opinion that as the *habendum* of a deed is that part of it which declares and limits the use of the thing conveyed, and as the negroes in question are limited in the *habendum* to the heirs of the body of Mrs. Stockton after her death, it created an estate tail of a chattel which was too remote, and vested the property in the first taker," &c.

In no part either of the deed or will, in the case at bar, are the words *heirs of her body* ever used except with accompanying words of explanation. And this circumstance strikingly distinguishes this case of Stockton *vs.* Martin (2 Bay, 471) from the case at bar, and shows its total inapplicability. But it may be remarked that the de-

cision in Stockton *vs.* Martin is erroneous in determining that the *habendum* of a deed shall govern the *premises* in such a case. This particular question was ably discussed in the case of Rogers *vs.* Rogers, 3 Wend., 503—which case was briefly as follows:—A devise in these words, "I give, devise and bequeath to my son Thomas Rogers, Jr., for and during his natural life, and the *children* of his body lawfully begotten, after his decease, all that certain, &c. (describing the premises,) to have and to hold the last mentioned premises unto my said son Thomas Rogers, Jr., for and during his natural life, and after his decease to the *heirs* of his body lawfully begotten, and to their heirs and assigns forever." Held to convey to Thomas Rogers, Jr., a life estate only, remainder in fee (the statute turning estates tail into fee) to his children. In this case the *habendum to the heirs* (which would have brought the case within the rule in Shelley's case, and conferred the whole estate upon Thomas Rogers Jr.,) was construed not to control the premises which devised to the children ; and this for two reasons; first, because the *intention* of the testator is clearly that way, and intention must govern where *technical* words are not *uniformly* used ; and second, because even in a deed the *habendum* must give way to the premises. Plowden, 153; 4 Cruise 229 ; 4 Cruise, title *deed*, chapter 20, sec. 77 ; 2 Cokes Rep. (Buckler's case) 55 a ; 4 Cruise, 226.

From these authorities, therefore, it appears very clearly that the case of Stockton *vs.* Martin would have been a case directly in our favor had the point upon which it turned been correctly decided.— And this is also a perfect answer to any objection which has been or may be made, that, in the deed under consideration, the premises are to the heirs of the body surviving, &c., *habendum* to the heirs generally ; for, if the superadded words are sufficient to show that the words used in the premises mean children, no words in the *habendum* can control that inference.

The doctrine of the foregoing cases is also very distinctly stated in Bacon's Abridgement, Vol. 6, p. 198, where it is said, " testator bequeathed to his wife ' a negro girl named Hannah and my horses, &c., and my plantation and all the lands adjoining to it, during her life time,' held to pass but a life estate in the negro girl,"—citing Black *vs.* Ray, 1 Dev. and Bat., 334.

Also, " a bequest of a slave for life with remainder to the lawful heirs of B., who it appears from the will was alive, is a bequest to

the children of B. and is to be divided among those who shall be *in esse* at the death of the first taker, and is not confined to those born at the death of the testator," citing Simms *vs.* Carrott, 1 Dev. and Bat. Eq., 393.

The leading case in Pennsylvania on this subject is that of the Lessee of Findlay *vs.* Riddle, 3 Binney, 139. In that case, the facts were these, viz: John Findlay, the elder, gave a certain tract of land to his son, John Findlay, during his natural life, and after his decease, if he should die leaving lawful issue, TO HIS HEIRS, as tenants in common, and their respective *heirs* and assigns forever. But in case John should die without having lawful issue, then he gave said land to his brother, James Findlay, and his *heirs* and assigns forever. After very long and able arguments on both sides, in which all the cases on this subject were cited and commented on, the Supreme Court decided that John Findlay *took only a life estate,* and Mr. Justice Yates, in concluding the opinion of the Court, said " I, therefore, feel myself authorized to construe the word *heirs,* in the first part of the devise, as *children* or *sons and daughters,* and as a mere *designatio personarum.*" See this remark of J. Yates, p. 161.

The same doctrine has been established in Virginia. In the case of Warners *vs.* Mason & wife, 5 Mun., 242, William Warner devised to his son, William, a tract of land " during his natural life, and then to his heirs, lawfully begotten of his body, that is, born at the time of his death or nine calendar months thereafter," and for want of such heirs, remainder over to his two grandsons, Jacob and George. William Warner, the first taker, dying without heirs, devised the same land to his sister, Mrs. Mason, who took possession thereof. The grandsons, Jacob and George, brought ejectment for the land, and the Supreme Court decided that the words ' heirs of the body lawfully to be begotten, that is born at the time of his death,' &c., were words of purchase and not of limitation. Consequently, it was held that William, the first taker, took only a life estate, and that Jacob and George, the grandsons, took by way of contingent remainder, William having died without children.

In the case of Higginbotham *vs.* Rucker, 2 Call, 265, it was decided thus : " A man makes a gift of slaves to his daughter and the *heirs of her body,* and in case she died without issue, that is, children of her body, the said slaves to return to the grantor. This limitation is not too remote and, therefore, is good."

Joseph B. Watts, Administrator of Thomas T. Clardy, *vs.* James Clardy.

In the case of Dunn and Wife *vs.* Bray, 1 Call's Rep., 294, the words of the devise are: "I give and bequeath unto my son Winter Bray, one negro boy named Peter, and a negro wench named Dinah, and her increase, to him and his heirs forever; but in case my said son Winter should *die and leave no issue*, THEN I give all the said negroes, hereinbefore devised to my said son Winter, to my son Charles and his heirs forever." Held "that in the present devise the remainder over to Charles (which was clearly intended to take effect upon the death of Winter, without leaving issue living at the time of his death, and not upon a general failure of issue,) is good as an executory devise within the rule" of exception to the rule in Shelley's case. Here the *intention* is made to supply the words "living at the time of his death," which are not in the will. In the case at bar similar words are inserted, viz: "which shall survive her."

Where a testator bequeathed the improvement of certain personal property to his daughter during her natural life and at her decease to be equally divided among her heirs, it was ruled that by the word *heirs* was intended *children*, and that the legatee took an interest for life in the property with remainder to her children. Ellis *vs.* the Props. Es. M. Bridge, 2 Pick., 243.

2d. But there is another rule laid down by Kent, 4th Vol., 222, for the purpose of determining when the words *heirs of the body*, &c., shall be construed as words of limitation and when of purchase. He expresses it thus:

"If the term heir, as used in the instrument, comprehend the whole class of heirs, and they become entitled, on the death of the ancestor, to the estate, *in the same manner*, and to the same extent and with the same descendible qualities as if the grant or devise had been simply to A. and his heirs, then the word heirs is a word of limitation, and the intention will not control the legal effect of the word."

We shall attempt to show that this property would not, under this grant and will "descend *in the same manner* as if the grant had been simply to A. and her heirs." If this property had been granted or devised simply to *A. and her heirs*, how would it have descended in the event that A. died leaving two children and twelve grandchildren by one of her deceased children? I answer, it would have descended so that the property would have been equally divided into

three parts, of which A.'s two children would have taken two parts, and her twelve grandchildren the other part—the grandchildren taking *per stirpes*. But does the property descend "in the same manner" under the provisions of this deed and devise, supposing the words heirs to have its legal meaning? Certainly not; for it is given "to the heirs of her body which shall survive her, *to be equally divided amongst them;*" now a grandchild comes within the technical meaning of the word *heir*, just as much as a child. Consequently, giving the word *heirs*, in this deed and devise, its technical meaning and carrying into effect the provisions of the devise in the case supposed, we would have to divide this property, not into three, but into fourteen parts, of which each of the heirs, children and grandchildren, would take one part. The grandchildren in this case would take *per capita* and not *per stirpes*, so that it is very clear that the *heirs* of A. would not "become entitled to the estate of their ancestor *in the same manner, and to the same extent, and with the same descendible qualities* as if the grant or devise had been simply to A. and her heirs." Therefore, if Kent be correct, the word *heirs* in this deed and devise *must be* construed not as 'a word of limitation, but a word of purchase.' See 3 Binney, 158, 166.

As to the will in this case, the view here taken is equally applicable as to the deed. The property is loaned to Anner Clardy for life, and "after her decease to return to the heirs of her body, share and share about;" so that the will falls literally within the two rules of exception shewn to control and explain the deed.

We, therefore, conclude that this case is clearly embraced in two of the rules which exempt wills and deeds from the operation of the rule in Shelley's case. The reported cases cited are offered rather to prove the application of these rules to the case at bar, than to prove the existence of those rules, which we contend they do abundantly. These authorities, we think, should be regarded as of more weight than those from England. They are regarded as leading cases, and are from the States of South Carolina, North Carolina, Virginia, Pennsylvania and New York.

It is obvious from the face of these instruments that if the children of Anner Clardy are deprived of this property, it will be in spite of the "clear and unequivocal" intention to the contrary of their grandfather, William Gore.

49

Joseph B. Watts, Administrator of Thomas T. Clardy, vs. James Clardy.

BALTZELL, J., delivered the following opinion:

The will and deed under which both parties claim in this case having been made in the State of South Carolina where the testator and grantor lived and where the property at the time was, the laws of that state as administered by her judicial tribunals must form the rule of its decision. Story's Conflict, 402, 409; 4 Wilson and Shaw, 28, 37.

Referring to them we find that as early as the year 1795 a devise " of negroes to a daughter distinct from her husband during her life and at her death to the heirs of her body," was held to create an estate tail, the words were considered words of limitation and not of purchase, and were adjudged to vest an absolute interest in the daughter. Dott vs. Cunn., 1 Bay, 453. In 1833 the terms " I *lend* to my daughter Peggy Starke four negroes, and to another daughter other negroes *during their natural lives, and then to the heirs of their bodies,*" with an appointment of executors of the will " in trust for the intents and purposes therein contained," were likewise adjudged to create an estate tail so as to vest an absolute interest in the daughter, and that the marital rights of the husband attached giving to his administrator the right of the property after his death,— Judge O'Neill who delivered the opinion of the Court saying " I have struggled to give effect to what I believe the clear intention of the testator that Mrs. Starke should take an estate for life and her children at her death should take as purchasers. But the technical rule is too strong and too well settled that the words heirs of the body must be considered words of limitation and not words of purchase and that consequently the estate vests in the first taker." Hinson and Wife vs. Picket, 1 Hill, 37. This case is decisive of all the points in the present controversy, the terms " *heirs of the body,*" " *lend,*" and the trust in the will, or tantamount expressions thereto having been all very fully considered. The only difference is in the expressions " share and share about," to be found in the will before this Court, and " hath given to the heirs of her body which shall survive her," and to " be equally divided between her surviving heirs as their exclusive property," in the deed. We have not been able to find a direct adjudication in South Carolina upon these; the nearest approach to it being the case of Stockton vs. Martin in which the deed was " to the *daughter during her life and then* to her chil-

dren *share and share* alike, habendum to the daughter for life and the heirs of her body with a warranty to the like effect. The majority of the Court held the habendum the controlling part of the deed and adjudged an estate tail so as to give the property to the first taker. 2d Bay, 471.

This case might be regarded as decisive so far as the words "share and share about" are concerned, as they formed a component part of the deed, and if not noticed by the Court as material, this of itself would be indicative of their opinion as to their immateriality. There is weight too in the fact that no case of recent date has been cited to us of the same Court overruling or calling in question its authority, and none coming within our reach we have been strongly inclined to the opinion that it should be held as conclusive. We have not thought proper in a case like the present where a question is raised as to the law of a sister state to inquire into the grounds or reason for a decision, made or given by her Courts and to say what they ought to have decided. This would be transcending our powers and assuming an office for which we are by no means disposed to assert our compctency—it would be treating a Court long distinguished for intelligence and ability with less than the regard justly its due either by courtesy or the rules of law. Our duty is to ascertain the law of that state, by no means to say what it ought to be. Their decisions on this subject will, we think, be found in harmony with the English law which they profess to follow as will be seen in numerous cases to which a reference may be given, so that we have the less reluctance to give to them all the weight of a decisive authority on the very point in question.

"The terms share and share alike create a tenancy in common." Bunch *vs.* Hurst, 3 Des., 288 ; Woodgate *vs.* Unwin, 4 Sim., 129 ; Westcott *vs.* Cady, 5 John. Ch., 334.

In the case of Doe and Candler *vs.* Smith " where a testator devised freehold lands to his daughter and the heirs of her body forever as tenants in common and not as joint tenants and in case of her dying without issue then over, it was held that the daughter took an estate tail." 7 D. & E., 532. So in Pierson *vs.* Vickers, 5 East., 548; Bennett *vs.* Earl Tankville, 19 Vesey, 170; Cole *vs.* Goldsmith, 7 Taunt., 209.

In Jenson *vs.* Wright decided in the House of Lords after full argument (and Lord Eldon said no case was ever better argued at

that bar,) the devise was to W. and after his decease to the heirs of the body of W. in such shares as he should appoint and for want of this then to the heirs of the body of W. *share and share alike as tenants* in common and if but one child the whole to such child, &c., it was held that W. took an estate tail." 2 Bligh., 1.

So in the recent case of Bosnal *vs.* Harvey with like provisions. In Atkinson *vs.* Featherstone, " the devise was to I. and E. his wife for their natural lives, and for the life of the longer liver of them and after the decease of the survivor to the heirs of the body of E. by I. already begotten or to be begotten, to be *equally divided among them, share and share alike,*" it was held an estate tail.   1 Barn. and Ad., 944.

Survivorship is by no means an uncommon form of an estate tail —thus a grant to A. and B. and the survivor and the heirs of such survivor, is of frequent occurrence.   " The doctrine of survivorship is the distinguishing incident of title by joint tenancy, and therefore at common law the entire tenancy or estate, upon the death of any of the joint tenants went to the survivors, and so on to the last survivor who took an estate of inheritance."   " The common law favored title by joint tenancy by reason of this very right of survivorship."   4 Kent, 360.

We do not intend to convey the idea that in respect to the estate tail, there is a uniform entire joint tenancy.   On the contrary, it forms an exception to the rule " for inasmuch as the devisees with some exceptions cannot either in fact or contemplation of law have common heirs of their bodies, they are by necessity of reason tenants in common of the estate tail."   Co. Litt., 184, a ; 2 Vern, 545 ; Cooper, 777.

" As the reason, however, applies only to the inheritance in tail, and not, to the immediate freehold, the devisees are joint tenants for life with several inheritances in tail, so that on the death of one of them, whether he leave issue or not, the surviving devisee becomes entitled for life of his share under the joint tenancy and the inheritance in tail descends to the issue if any subject to such estate for life."   Jarman on Wills, 158.

Nor is restriction to particular heirs destructive to the estate tail —thus to the heirs male or female—to the first or next heir male. 8 Viner, 234.   Such an estate (estate tail) may be created " by an expression denoting an intention to give the devisee an estate of inheritance descendible to his or *some* of his *lineal,* but not to his col-

Joseph B. Watts, Administrator of Thomas T. Clardy, *vs.* James Clardy.

lateral heirs which is the characteristic of an estate tail as distinguished from a fee simple." 2 Jarman on Wills, 232.

The term "surviving heirs" is one of unusual occurrence in the books, for whilst we have " survivors" " surviving children" " sons" "issue" and " daughters," there is in the books no such word attached to heirs as far as we have been able to discover, and we are inclined to the opinion that so connected, it is without meaning, neither enlarging nor contracting the estate. The heirs of Mrs. Clardy from necessity are those who survive her at her death—they could not have preceded her. *Nemo est hæres viventis.* There is no heir until the death of the ancestor. The fair import of the clause then would seem to be that the estate is to go to the heirs of her body at her decease. If this view be correct the case is freed from difficulty, and the deed is a naked grant to the heirs of the body.

It may however be more satisfactory supposing that we are mistaken in this respect, to consider how far words superadded to the term heirs of the body, change the character of the devise and whether by possibility this word " surviving" may produce this effect. It seems that " if the superadded words of limitation operate to change the course of descent, they will convert the words on which they are grafted into words of purchase." Jarman, 276.

It is not to be inferred that the words heirs of the body, are incapable of control or explanation by the effect of superadded expressions, clearly demonstrating that the testator used these words in some other than their ordinary acceptation, and as descriptive of another class of objects. Some of the examples given of words producing this change are of a devise to a first, second, third, and every other *son* of B. and the heirs of the body of such, first, second, &c., son.

Love *vs.* Daviers, 2 Ld. Ray., 1561. To the first son of the body of E. and the heirs male of the body of such first son, and for default of such issue, to the use of the second son of the body of E., and so to all and every other, the heirs male of the body of E., and to the heirs male of their body according to seniority of age.

Lisle *vs.* Gray, 2 Lev., 223. These cases it is said leave no doubt of the design of the testator and we conceive do not. 2 Jarman, 302.

The cases bearing the nearest analogy to the present are to this effect. A person devised to his three daughters to be equally divided, and if any of them died before the other then the one to be

the other's heir equally to be divided, and if his three daughters died without issue then over, adjudged that his daughters took an estate tail. King vs. Rumbal, Cro. Ja., 448.

In Richards vs. Lady Bergaviney, the devise was to the Lady Bergaviney, and such heir of her body as shall be living at her death with remainder over, and it was adjudged an estate tail. 2 Vernon, 324.

A devise to W. for life, and after his decease to the use of the heirs, male, of the body of W., lawfully begotten, severally, respectively, and in remainder the one after the other, as they and every of them shall be in seniority of age, and priority of birth, gave W. an estate tail. Lord Thurlow said where the estate is so given that it is to go to *every person who can claim as heir to the first taker, the word* *heirs must be a word of limitation*. All heirs *taking as heirs* must take by descent. Jones vs. Morgan, 1 B. C. C., 206.

Now it is not perceived that the word "surviving" clearly demonstrates that the testator used it and the *word heirs of the body* in some other than the ordinary acceptation of the latter expression, and as descriptive of another class of objects. It is clear that it is not embraced within any of the cases which have been held to alter the rule. Obviously those who take as surviving heirs claim as heirs to the mother at her death, and taking as heirs they take by descent. According to our view the property would descend to the whole class of heirs of Mrs. Clardy, and they would become entitled to the estate in same manner, and to the same extent, and with the same descendible qualities as if the grant had been simply to her and her heirs. 4 Kent, 222.

It is scarcely necessary to quote authority to the effect that where personal estate is bequeathed in language which, if applied to real estate, would create an estate tail, it vests absolutely in the person who would be the immediate donee in tail, and it is immaterial whether the bequest itself contain the words of limitation or refer to a devise of realty creating an estate tail. 2 Jarman on Wills, 492; 1 Beav., 150.

We have been asked to consider this question as a new one, and and as if the cases of Doe & Laming, Doe & Goff, and a few others asserting a doctrine contrary to those cited to sustain the rule in Shelley's case still continued to be authority in the English Courts. It has been insisted that these cases have not been overruled, and are quite reconcilable with the later authorities; but we think dif-

ferently.    That great jurist the late Chancellor Kent, than whom no one could speak with greater truth and propriety on this subject says: " The rule in Shelley's case survived all the rude assaults which it received in the controversy under Perrin & Blake, and it has continued down to the present time in full vigor with command-ing authority, and with its roots struck immovably deep in the foun-dations of the English law.    All the modern cases contain one uni-form language, and declare that the words heirs of the body, wheth-er in deeds or wills, are construed as words of limitation, unless it clearly and unequivocally appears that they were used to designate certain individuals answering the description of heirs at the death of the party."    4 Kent, 228.

An English author of whose recent production the present Chief Baron of the Exchequer has spoken " as a very learned work," af-ter noticing the case of Perrin and Blake, says: " since this solemn determination the rule in question, has been regarded as one of the most firmly established rules of property, and strictly speaking no instance can be adduced of a departure from it."    2 Jarm., 243 ; 14 M. & W., 706.

The same author says, after speaking of the various cases op-posed to Doe vs. Laming, " we may then reasonably hope never to hear the case of Doe vs. Laming again cited as an authority in a Court of law."    2 Jarm., 288.

In Jessen vs. Wright, Lord Redesdale said : " It is impossible to decide this case without holding that Doe vs. Goff is not law."    2 Jarm., 292.

It is said : " if the children of Anner Clardy are deprived of this property it will be in spite of the clear and unequivocal intention to the contrary of their grandfather, William Gore."    To language of this kind we would oppose the forcible remarks of the Supreme Court of South Carolina in the case of Carr vs. Porter, with this additional observation, that after an acquiescence by the people of that State for upwards of fifty years in a law as announced by her Courts, it is rather too late to call in question its propriety.    The re-ply to such remark is best made in the language of the Court res-ponsible for the result to which we have arrived.    They condemn with great force and propriety the idea of a Judge making a decis-ion according to his own views of the intention of a testator.— " Wherever a construction has been given by a competent tribunal to any form of words, such decision has always been held obligato-

Joseph B. Watts, Administrator of Thomas T. Clardy, *vs.* James Clardy.

ry on all succeeding Judges in cases of wills as in any other cases. Fearne speaking of the notion that we must lay aside all precedent in the construction of wills, and that a Judge must be governed by his own views, says, ' such a mode of construing wills, if ever fully established, would open an almost unlimited power to the Judge of disposing of the property of testators, and diverting the circulation of it to his own mind.' If rules and maxims of law were to ebb and flow with the taste of the judge, or to assume that shape which in his fancy best becomes the times, &c., I should be glad to know what person would venture to purchase an estate without first having the judgment of a Court of justice respecting the identical title which he means to purchase." 1 McCord, 71.

After the most mature consideration we are of opinion that the Court below erred in giving judgment for the defendant. It should, in our opinion have been for plaintiff on the special verdict.